**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | |
|---|---|
| NORIE MATSUNAGA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> PLANET FITNESS, INC., COLLEEN KEATING, and JAY STASZ, <br><br> Defendants. | Case No. <br><br> **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **CLASS ACTION** <br><br> <u>Demand for Jury Trial</u> |

Plaintiff Norie Matsunaga ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to her own acts, and upon facts obtained through an investigation conducted by her counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by Planet Fitness, Inc. ("Planet Fitness" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Planet Fitness' public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Planet Fitness common stock between November 6, 2025, and May 6, 2026, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.      Defendants provided investors with material information concerning Planet Fitness' national rollout of an increase to its Black Card membership tier pricing and confidently touted the ability to continue the prior year's marketing campaign. Defendants relied upon expected membership volume growth and rate increases to confidently present a three-year growth algorithm. Defendants' statements included, among other things, confidence in the Company's brand health, its "We Are All Strong on This Planet" marketing messaging, and its purportedly resilient high-value, low-price ("HVLP") subscription business model.

3.      Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of Planet Fitness' customer acquisition and marketing metrics. Notably, the Company's updated marketing messaging was failing to resonate with, and was actively intimidating, its core target demographic of fitness beginners and casual gym-goers. As a result, Planet Fitness was experiencing a significant headwind in net member joins during its peak first-quarter sign-up period that rendered its previously issued fiscal 2026 guidance and long term financial targets unachievable.

4.      Instead, Planet Fitness would be required to restructure its marketing strategy, losing the gains they praised from continuing the same marketing campaign, and entirely halt the planned Black Card price increase which sale projections were premised upon. Such statements

absent these material facts caused Plaintiff and other shareholders to purchase Planet Fitness' securities at artificially inflated prices.

5. On May 7, 2026, Planet Fitness announced its financial results for the first quarter of fiscal year 2026, revealing that its critical peak sign-up period was off to a slower-than-expected start internally. Management slashed full-year 2026 growth guidance, notably slashing same-store growth from 4-5% to only 1%, and completely withdrew its long-term three-year growth algorithm it had introduced just six months prior. Planet Fitness attributed these results to an over-pivoted marketing campaign that failed to resonate with its core customer base, alongside external competition, macroeconomic, and weather related impacts. Management then announced they were pausing the planned national rollout of the Black Card price increase to prioritize revitalizing new membership growth.

6. Investors and analysts reacted immediately to Planet Fitness' revelation. The price of Planet Fitness' common stock declined dramatically. From a closing market price of $63.96 per share on May 6, 2026, Planet Fitness' stock price fell to $44.01 per share on May 7, 2026, a decline of about 31.19% in the span of just a single day.

## JURISDICTION AND VENUE

7. Plaintiff brings this action, on behalf of herself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

8. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

10.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant Planet Fitness is headquartered in this District and a significant portion of its business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

11.    In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

12.    Plaintiff purchased Planet Fitness common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing her transaction(s) in Planet Fitness is attached hereto.

13.    Planet Fitness, Inc. is a Delaware corporation with its principal executive offices located at 4 Liberty Lane West, Hampton, NH 03842. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "PLNT."

14.    Defendant Colleen Keating ("Keating") was, at all relevant times, the Chief Executive Officer and Director of Planet Fitness.

15.    Defendant Jay Stasz ("Stasz") was, at all relevant times, the Chief Financial Officer of Planet Fitness.

16.    Defendants Keating and Stasz are sometimes referred to herein as the "Individual Defendants." Planet Fitness together with the Individual Defendants are referred to herein as the "Defendants."

4

17.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Planet Fitness' reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

18.     Planet Fitness is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

19.     The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Planet Fitness under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

20.     Planet Fitness is a global company with a majority U.S. presence. They are one of the largest franchisors and operators of fitness centers in the world by member count and location footprint.

21.     The Company operates and reports its financial results through three corporate segments: (i) Franchise, which manages franchise operations and collects royalties; (ii) Corporate-Owned Clubs, which directly operates a domestic portfolio of clubs; and (iii) Equipment, which sells and handles the mandatory replacement of exercise equipment for franchisee locations.

***The Defendants Materially Misled Investors Concerning***

***Planet Fitness' Long-Term Prospects***

<u>*November 6, 2025*</u>

22.     On November 6, 2025, Defendants issued a press release announcing results for the third quarter of fiscal 2025. In pertinent part, Defendant Keating was quoted highlighting their "significant progress in executing our long-term strategy" and praised the "strategic decisions" management has made "to position the Company for long-term growth."

23.     During the same-day earnings call, Defendant Keating continued her praise of the Company's performance, stating, in pertinent part:

> In the third quarter, ***we continued with our "we are all strong on this planet" marketing campaign*** that highlights our best-in-class equipment, our welcoming atmosphere and the supportive community we offer. Our strong join trend has continued, and our member count at the end of Q3 was in line with our expectations. We also saw increased Black Card penetration in the quarter with 66.1% of our total membership now at the higher tier, a 300 basis point increase from the same quarter last year. ***Consumers continue to recognize the value of the Black Card with the smallest price gap between our 2 membership tiers since we launched the Black Card***.

(Emphasis added).

24.     Defendant Keating continued, unveiling price point and timing for the permanent raise to the national price point for the Company's "Black Card" membership, in pertinent part:

> As many of you know, we held off on increasing the price of our Black Card membership until we got on the other side of the Classic Card price increase anniversary. ***After thoughtful consideration, significant testing and data analysis, we've made the decision to raise the Black Card price to $29.99 after our peak***

*join season in 2026.* We're also continuing to test new Black Card amenities such as dry cold plunge and red light technology that would add even more value to our Black Card offering. We unveiled several of these potential new offerings to our franchisees last week at our annual franchisee meeting and they were met with great enthusiasm. We look forward to sharing our plans to modernize the Black Card Spa at our Investor Day next week.

(Emphasis added).

25.    Defendant Stasz elaborated on the pricing decision during the question-and-answer segment of the call in the following pertinent exchange:

<Q: Jonathan Robert Komp – Robert W. Baird & Co. Inc. – Senior Research Analyst> I want to just follow up. Could you maybe talk a little more directly when you look at the guidance raise for the year, combined with the confidence to commit to the Black Card pricing after your peak period coming up? Could you maybe just talk about more directly what's driving your increasing confidence to announce both of those today?

<A: Jay Stasz> . . . In terms of the Black Card price increase, so as we said, *we've tested this, we've analyzed it and made the decision to go to $29.99*. When we've tested that, obviously, we've had -- it's been accretive to the AUV. So we're not going to really comment on the impacts for next year. We'll get to that when we actually do the price increase. But historically, what we have seen when we've made a change on the Black Card price is that the acquisition rate on Black Card does decrease for a period of time but usually rebounds within the year so that the penetration of Black Card gets back to where it was. The wrinkle and the difference now is that we've had the Classic Card price increase. So that increase is an element that we haven't had historically. So we'll have to wait and see on that. But again, *we would expect for that Black Card price increase to be accretive to AUV*.

(Emphasis added).

*November 13, 2025*

26.    On November 13, 2025, Defendants conducted Planet Fitness' 2025 Investor Day. To open the day, Defendants issued a press release highlighting their confidence in Planet Fitness' trajectory, stating, in pertinent part:

27.    The press release further provided the Company's "long-term growth outlook for fiscal years 2026-2028:

7

| Revenue | Low-double digit percent CAGR |
|---|---|
| System-wide same club sales growth | Mid-single digit percent |
| New club unit growth | 6% to 7% range |
| Adjusted EBITDA | Mid-teens percent CAGR |
| Adjusted net income per share, diluted | Mid-to-high teens percent CAGR" |

28.    During the Investor Day shareholder call, Defendant Keating pertinently highlighted the Company's recent marketing efforts, praising its success and claiming Planet Fitness will save costs by being able to continue to rely on the same campaign:

> *Our marketing messaging this year has performed quite well and has legs to extend into 2026, which will give us the opportunity to put more of that money to working media because we won't be developing a full new campaign*.
>
> The *messaging is resonating* and most importantly, *it's driving joins*. Through Q3, we increased net membership by roughly 1 million members. This is even more impressive when you consider that this is on top of a 50% lift on our entry-level price point. *It speaks to our high value offering and the effectiveness of our marketing*. In 2026, we will allocate more to our national ad fund to unlock opportunities for even greater conversion to better leverage our size and scale and to accelerate top line growth.

(Emphasis added).

29.    Further in the call, Defendant Stasz praised Planet Fitness' continued comparative sales growth, highlighting how the new guidance model incorporates the Black Card price increase as a factor for this continued growth, stating, in pertinent part:

> When it comes to top line, *our comp sales trends are impressive, a clear indication of the durability of this business even before the golden age of fitness*. We had 53 consecutive quarters of comp sales growth coming into COVID. That's more than 13 years. And now we're building a new trend, 17 quarters since coming out of COVID, strong and consistent results and cash flow. Now looking ahead, I'm going to go a little deeper into 3 topics: our club level returns, our capital allocation strategy; and finally, our 3-year algo.
>
> Let's start with club level returns. *The results we're seeing from our recent openings and how they're tracking to our internal return targets. You've heard a lot about all the great work we're doing to drive top line, which we know wins the day in terms of unit economics*. Our strength -- our work to strengthen club returns include these items. Many of you've heard about before and many you heard about today.

8

The new growth model focused on improving franchisee unit economics, reducing capital cost and extending reequipped time lines. And ***to support the top line, we did the Classic Card price increase last June or June '24, and we've announced the Black Card price increase in 2026.*** We know that top line is the lead dog. That's why we've built a Blue Ribbon team to execute the strategic imperatives you heard about today, driving member experience in the capital HV in HVlp.

(Emphasis added).

30.    Returning to the guidance itself, Defendant Stasz further elaborated on Planet Fitness' new 3-years of annual targets, pertinently, as follows:

This brings me to ***our long-term growth algorithm***. You've heard about the strategic imperatives and the work our team is executing, which allow us to continue to deliver strong financial results. Here, you can see our annual targets for the next 3 years. ***Revenue growth in the low double digits, adjusted EBITDA in the mid-teens and adjusted EPS in the mid- to high teens***. Now let me walk you through the building blocks of each one to show you how we'll get there.

***Our revenue growth will be made up of same club sales and unit growth***. We expect same club sales of mid-single digits, driven by approximately 75% rate and 25% volume. ***The split reflects the Classic Card price increase in June of '24 and the planned Black Card price increase in '26***. We will always focus on driving membership. The 25% contribution is significant, still growing members in mature clubs, which make up the majority of our comp base.

(Emphasis added).

*January 13, 2026*

31.    On January 13, 2026, Defendants presented at the ICR Conference 2026. During the conference, Defendant Stasz confidently suggested the Company's was prepared to rollout the Black Card price increase during the following pertinent exchange:

<Q: Randal J. Konik – Jefferies LLC – Equity Analyst> That's great. And from a pricing perspective, we've seen the benefits of the White Card going from $10 to $15. The comps have been pretty strong in the business, a mixture of price growth plus member growth. You've indicated at the Analyst Day that you are intending to drive up the -- or take up the price on the Black Card from $24.99 to $29.99. But we also have an environment where the consumer seems to be price sensitive, right? So when you think about the price increases on the White Card and now the Black Card and you've done well with the White Card, what gives you confidence that the

9

Black Card increase will take very well? And do you think you have to enhance the amenities in the business, perhaps the Black Card spa to kind of help with that price value equation in the business?

. . .

<A: Jay Stasz> Yes. So Randy, I can speak to that. I mean, as we talked about at Investor Day, we are in the golden age of fitness, right? You can't open up a headline and not see the importance that's being focused around fitness training, movement and strength training. In addition, Gen Z, right, they grew up with fitness, and it's just part of their daily routine. So when we think about consumer and the way they spend their dollars, we think there's a -- we are in a good position where they're going to choose to spend those discretionary dollars to maintain fitness and health.

It's just part of who they are and what they do. So that's kind of from a consumer lens that we think about it. And then from other lenses, when we look at the business, obviously, *since we've done the Classic Card price increase about 18 months ago, we've seen overall penetration of the Black Card increase to Q3 was just north of 66%, so an all-time high. So that -- those are some other metrics that we look at internally that tell us we have the ability to take price.* Obviously, the 2 most used benefits of the Black Card are reciprocity, so use any club and then bring a guest.

So to your question, right, we are testing and planning to continue to test new modalities in the Black Card spa, and we can get into that more later, but *the early reads are very strong, and there are some modalities that really resonate with the consumers today and will provide value*. So absolutely, we're going to do that, but *we don't think we need to have that as we roll out the Black Card price to $29.99*. And at $29.99, we think it's an incredible value with the equipment we offer, with the experience we offer today. And even at that price point, we'll still be below the average in the median of a monthly gym membership on a national basis.

(Emphasis added).

### *February 24, 2026*

32.    On February 24, 2026, Defendants unveiled fourth quarter and full-year fiscal 2025 results. In its release, Planet Fitness detailed its 2026 outlook as follows:

For the year ending December 31, 2026, the Company expects the following:
- New equipment placements of approximately 150 to 160 in franchisee-owned locations
- System-wide new club openings of approximately 180 to 190 locations

The following are 2026 growth expectations over its 2025 results:

- System-wide same club sales growth in the 4% to 5% range
- Revenue to increase approximately 9%
- Adjusted EBITDA to increase approximately 10%
- Adjusted net income to increase in the 4% to 5% range
- Adjusted net income per share, diluted to increase in the 9% to 10% range, based on adjusted diluted weighted-average shares outstanding of approximately 80.0 million, inclusive of shares expected to be repurchased.

The Company also expects 2026 net interest expense to be approximately $114.0 million. It also expects capital expenditures to increase approximately 10% to 15% driven by additional clubs in our corporate-owned portfolio and depreciation and amortization to increase approximately 10% compared to 2025.

33.     During the corresponding earnings call, Defendant Keating touted Planet Fitness' "strong year-over-year results," praising, in part, the Company's ongoing marketing campaign extended from the previous year, pertinently as follows:

> We continue to lean into our -- *we are all strong on this Planet campaign*, which effectively showcases our best-in-class equipment and support of atmosphere. This *follows our 2025 strategic shift in our messaging approach, leading with the compelling why Planet Fitness message*, followed by a why Planet Fitness now call to action to reengage lapsed members and attract new ones. *Because this campaign resonated so strongly last year, we extended it into 2026. By maintaining this consistency, we avoided the cost of developing a completely new creative platform from scratch while updating creative assets, focusing on differentiators for our brand. This efficiency allowed us to redirect those savings into high-impact working media to drive even greater reach*. The agreement with our franchisees to shift a portion of contributions from the local ad fund to the national ad fund for 2026, beginning in the second quarter allows us to move faster in executing on several strategic initiatives.

(Emphasis added).

34.     Defendant Stasz spoke to the Company's posted guidance, which highlighted and incorporated "2 short-term transitory items" that slowed join trends in the early quarter. In pertinent part, Defendant Stasz provided the following:

> Now to our outlook. *We knew this year would represent the lowest growth year in our 3-year algorithm for 2 primary reasons*. First, the extended replacement cycle for equipment as part of our new growth model that we rolled out in '24. Second, in Q3 of last year, we sold 8 corporate-owned clubs in California. Transitioning these clubs from the corporate-owned segment to the franchise segment aligns with

11

our asset-light strategy, yet reduces our revenue and profit year-over-year growth in '26. We've seen strong join demand during the quarter, a clear signal that our brand value and offerings are resonating. ***We've also experienced 2 short-term transitory items quarter-to-date. Our join trends were impacted by the storms and cold weather in late January across many of our markets, and we experienced a slightly higher cancel rate last month than anticipated***. Notably, recent attrition trends are returning in line with our expectations.

Now to our guidance for '26, which incorporates the factors described earlier. ***We expect system-wide same club sales growth of 4% to 5%.*** We expect to open 180 to 190 new clubs system-wide. Like last year, we anticipate the cadence of these openings and the related 150 to 160 equipment placements to be weighted toward the second half of the year and especially the fourth quarter. We expect reequipment sales to represent approximately 70% of total segment revenue, and we expect an equipment margin rate of approximately 30%. We expect total revenue growth of approximately 9% over 2025. We expect adjusted EBITDA to grow approximately 10% over 2025. We project adjusted net income growth in the 4% to 5% range. On a per share basis, we expect adjusted diluted EPS to increase between 9% to 10%. This is based on approximately 80 million adjusted diluted weighted average shares outstanding, which includes the impact from our ASR entered into at the end of last year and our plan to repurchase approximately $150 million worth of shares in 2026.

We anticipate 2026 net interest expense of approximately $114 million, reflecting the annualized impact of our 2025 refinancing. Lastly, we expect capital expenditures to be up between 10% and 15% and D&A to be up approximately 10%. ***We reiterate our 3-year growth algorithm that we outlined at last year's Investor Day***. The strategic imperatives and growth initiatives we outlined continue to build momentum, positioning us well to deliver against our long-term objectives. The fundamentals of our business are strong. ***The model is resilient***, and we continue to generate significant cash flow that enables us to return value to shareholders.

(Emphasis added).

35.     A question-and-answer segment followed the Defendants' prepared remarks. During the segment, Defendant Stasz discussed the Company's relatively soft 2026 guidance considering the reaffirmation of the 3-year growth algorithm Defendants had previously provided, during the following exchanges, in pertinent part:

<Q: Randal J. Konik – Jefferies LLC – Equity Analyst> I guess, Jay, a question for you is when you look at the '26 guide and you think about -- you just reiterated your 3-year growth algo that you gave at the Analyst Day. Give us some perspective on what does that mean for the 2 out years in terms of shaping the revenue growth,

unit expansion and EBITDA dollar growth. How are we supposed to think about that as we think further from '26 into '27 and '28.

<A: Jay Stasz> Yes. Randy, thanks for the question. And as we said, right, *we knew that this year would represent the lowest growth year in the 3-year algo because of the reequipped cycle and because of the sale of the California clubs*. So those impacts, if we think about that on the year-over-year growth for this year is about a 300 basis point impact to top line and about a 200 basis point, slightly north of that on the EBITDA. So obviously, that was contemplated and known. *Also included in our guidance this year are, like we mentioned, just some transitory to a much lesser extent, transitory headwinds related to the weather impact and joins,* which we can talk more about as well as a slight elevation in attrition versus our expectations that we saw in January, which is now normalized. But to your point, right, *we have reiterated our commitment to the 3-year algorithm, and we expect to get back to those targets that we laid out both for revenue and EBITDA over the 3-year period.*

And to your point, so there's a bit of a step-up in the out years. I think you guys can probably all calculate and do the math. We expected, and this is not dissimilar to what we rolled out with our 3-year algo at Investor Day. We didn't indicate that the algo was going to be an annual growth rate. But certainly, the strategic imperatives, we see the traction and they are building. And the beauty of this model is that once we start to continue to drive revenue and net member growth, there's significant flow-through to the bottom line. So we see increases in both year 2 and year 3 of that growth algo to get back to the targets we laid out.

. . .

<Q: Christopher Thomas O'Cull – Stifel, Nicolaus & Company, Inc. – MD & Senior Analyst> Colleen, I'm trying to understand the 4% to 5% comp guide. The company should have the coming benefit of the Black Card pricing, a 25% increase, I think, in media impressions from the additional ad dollars and then just the residual benefit of the Classic Card pricing. So I mean, in the fourth quarter, comps were up almost 6%. *So can you help us understand why comps are expected to slow?* I mean, is this conservatism or the higher cancellation rate? I'm just trying to understand how to think about this guidance.

<A: Jay Stasz> Yes. Chris, this is Jay, and I can start with that. I mean a couple of things, right? You've got to -- I mean, this is a subscription model. And when we think about our comp base, obviously, I mean, one small factor is the fact that stores enter the comp base after the 13th month. So when we opened 150 clubs in '24, those are going to largely impact '26, and that was a low club opening year compared like if you think about the 181 that we just opened, which will impact '27 really. So that's a component of it. And then the other piece is just we've got a large installed base of clubs that generate a ton of cash flow. So even to your point, with the lifts that we will see from rate, it just takes a lot to move that needle from a

comp standpoint. Obviously, embedded in that comp guide is the fact that we've had a little bit higher attrition than typically, certainly year-over-year since we did the national rollout. And again, we would expect that to moderate as we lap that in Q2.

(Emphasis added).

36.    Defendants further discussed the impact of the Black Card price increase and its integration into the company's fiscal 2026 guidance, in pertinent part, as follows:

<Q: Simeon Avram Siegel – Guggenheim Securities, LLC – Senior MD & Consumer Equity Research Analyst> So Jay, just for the guidance, how are you thinking about Black Card penetration and then price versus member growth embedded within those revenues? And then just because we're talking about January, just -- I guess, Colleen, we've been talking about smoothing out the seasonality of your joins. So how do you think about the significance of a challenging weather January now for Planet Fitness versus maybe how we would have thought about it historically?

<A: Jay Stasz> Yes. So I can start with that. I mean, obviously, from a join standpoint, right, we've talked about -- in the past, I think historically, they talked about 60% or so of joins coming in the first quarter. Obviously, in the past couple of years, it's been higher than that. We've talked about consistently the ability to get net member growth across several quarters. So -- and I'll let Colleen speak to it more, but we've got lots of things that we can do, and *we're seeing traction on the strategic imperatives to drive joins*. In terms of your question on Black Card penetration, I mean, we are seeing -- *in the fourth quarter, we continue to see highest ever Black Card penetration at 66.5%. So that is a benefit to rate*. As we think about the guide and the comp, we're expecting about a 75-25 split, 75% being rate, 25% being volume or membership growth.

<A: Colleen Keating> And I'll just maybe build a little bit on what you said about the January joins. And Simeon, as you've seen, we've been successfully running promotions and experiencing net member growth in quarters outside of Q1. This past year, Q4, we had net member growth prior year in the back half, we also had net member growth. So you'll continue to see us deploy marketing in quarters outside of the first quarter. And I think a couple of things important to note. Coming through 2025, with 1.1 million net new members, that was a 10% increase on net new members versus the prior year 2024.

*And it was our first full year of the elevated Classic card pricing as well as the first year that we rolled out nationwide online member management. So that, coupled with, as Jay mentioned, we were seeing strong join trends coming through January prior to the storm impact. I think all of those things together give us real confidence in the momentum that we're seeing in the business*.

14

. . .

<Q: Maksim Rakhlenko – TD Cowen – Director> Got it. That's helpful. And then, Colleen, what's the latest thinking around the timing of the Black Card price increase? And how do you think that it will change the complexion of the comp build as well as the Black Card mix? And then is it already embedded in the guide? Or are we going to get an update once you do roll out the Black Card price increase?

<A: Colleen Keating> Great question. So *we indicated that we would roll out Black Card -- the Black Card price increase after our peak join season*. For competitive reasons, we're not being overly specific, but you know our business well, and you know when our peak join season is. And I think where we took the Classic Card price increase 2 years ago is kind of a directional indication.

*Q3, obviously, is our lower join quarter. So that will give you an indication of when we're anticipating to roll that out*. And as we've said, as we've increased our Black Card penetration over the past couple of years, we know we have gotten some organic rate lift out of the increased penetration, and we expect to continue to get -- to be able to take impact from pricing in the comp from the Black Card price lift. *And I think we've given directionally anticipated in the comp about 75%-ish coming from rate, 25-ish coming from volume.*

(Emphasis added).

### March 9, 2026

37.    On March 9, 2026, Defendants filed a Form 8-K with the SEC, announcing sudden departure of Defendant Stasz from his role as Chief Financial Officer, effective same-day.

38.    A press release accompanied the news, with both announcing Planet Fitness' previous Chief Financial Officer, Tom Fitzgerald, would take on the interim role while the Company looks for a permanent replacement.

39.    Neither the Form 8-K nor the press release referred to the reasoning behind Defendant Stasz's departure, beyond to assert it "was not the result of any dispute or disagreement with the Company relating to reported financial statements and related financial results." Defendant Stasz did not provide any statements for either the filing or the release.

15

40.    Notably, the Form 8-K disclosed Defendant Stasz "will be eligible to receive severance" due to "his departure from the Company."

41.    The release did indicate that despite the transition, Planet Fitness was "***reaffirming its 2026 financial guidance***, as previously announced on February 24, 2026" (emphasis added).

42.    The above statements in Paragraphs 22 to 41 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the Company's ability to nationally rollout the Black Card price increase, to Planet Fitness' projected membership growth outlook and associated sales growth, and to the Company's ability to drive new joins on its existing marketing campaign, purportedly saving the Company additional funds, while also minimizing risks from seasonality, weather-related events, and general macroeconomic fluctuations. Planet Fitness notably reiterated its forward guidance twice during the first quarter and previously noting ongoing and early-quarter impacts from weather-related events. In truth, the Company's projections, both for fiscal 2026 and in its three-year growth algorithm, fell short of reality; Planet Fitness could not continue to grow its membership rate at the level necessary without a significant overhaul to its marketing message or the introduction of new marketing campaigns, nor could it proceed with the planned rollout of the Black Card price increase that such guidance was significantly reliant upon.

### The Truth Emerges during Planet Fitness' First Quarter Earnings Report

#### May 7, 2026

43.    On May 7, 2026, Defendants announced first quarter results for fiscal 2026 that "exceeded expectations," yet were coupled with significantly reduced guidance. In pertinent part, Defendant Keating was quoted on the release, explaining the situation as follows, in pertinent part:

> In the first quarter, our top and bottom line results exceeded expectations. However, ***2026 is off to a slower than expected start from a net member growth perspective***

16

*as we faced internal and external headwinds during our peak sign-up period*. As a result, we are sharpening our marketing to prioritize capturing demand and driving net member growth. Additionally *we are pausing the planned national Black Card price increase pending a broader pricing review* . . . While *we are resetting near-term expectations*, we expect that these actions will help set the stage for enhanced top and bottom-line results in 2027. The fitness industry continues to benefit from a number of secular tailwinds given the growing awareness of the vital role movement plays in health and well-being. *Long-term, our thesis remains intact* and as the leader in the high-value, low-price segment, Planet Fitness is well positioned to capitalize on our industry leadership."

(Emphasis added).

44.     The release further detailed Planet Fitness' slashed fiscal 2026 projections as follows:

For the year ending December 31, 2026, the Company is reiterating the following expectations:
- New equipment placements of approximately 150 to 160 in franchisee-owned locations.
- System-wide new club openings of approximately 180 to 190 locations.

*Based on lower net joins than planned in the first quarter, which has an outsized impact on full year results due to the seasonal nature of the Company's subscription revenue model and the decision to pause the Black Card price increase*, the Company is updating certain of its 2026 growth expectations over 2025 results as follows:
- *System-wide same club sales growth of approximately 1% (previously 4% to 5%).*
- *Revenue to increase approximately 7% (previously approximately 9%).*
- *Adjusted EBITDA to increase approximately 6% (previously approximately 10%).*
- *Adjusted net income to decrease approximately 2% (previously an increase of 4% to 5%).*
- *Adjusted net income per share, diluted to increase approximately 4% (previously 9% to 10%), based on adjusted diluted weighted-average shares outstanding of approximately 79.0 million (previously 80.0 million), inclusive of shares expected to be repurchased.*

The Company now expects 2026 net interest expense to be approximately $111.0 million (previously $114.0 million). It also continues to expect capital expenditures to increase approximately 10% to 15% driven by additional clubs in our corporate-owned portfolio and depreciation and amortization to increase approximately 10% compared to 2025.

(Emphasis added).

45.     During the same-day earnings call, Defendant Keating discussed headwinds the company was facing that led to the decision to pause the Black Card price increase, reduce fiscal 2026 guidance, and withdraw long-term projections issued just 6 months prior, stating, in pertinent part:

> A recent Health & Fitness Association study cited that fitness memberships for 2025 were up 5.4% over '24, reflecting that the industry experienced solid growth last year as well. While this favorable backdrop remains in place, ***during our key Q1 sign-up period, we faced some internal and external headwinds that impacted our join momentum year-to-date***. As a result, we are taking targeted actions to reinvigorate member growth. We believe that a combination of 4 factors most directly affected our performance. ***First, our marketing largely resonated with a more fitness-minded consumer, yet had less resonance with the fitness beginner or more casual gym goer***, traditionally our sweet spot given our differentiated nonintimidating environment. ***Second, we saw some competitive impacts*** in certain markets, particularly South Central and Southeast U.S.
>
> ***Third, unfavorable weather conditions*** affected a number of regions during the quarter; and ***fourth, macroeconomic pressures and uncertainty*** weighed on consumers. Our overall performance reflects the strength and resiliency of our model. However, the addition of more than 700,000 net new members during the quarter did not meet our expectations. While this was driven by multiple factors, refining our marketing messaging and targeting is directly within our control. ***We are making immediate and near-term adjustments to broaden our reach and ensure our messaging is both visible and resonates with the fitness beginner and more casual gym goer.***
>
> Before I further address that, let me provide some context on how the year has unfolded. Member join trends were solid in the first 2 weeks of January, partially offset by temporarily elevated churn. ***Severe cold and winter weather in late January and February disrupted joins***, especially as several of the storms fell on Mondays, our busiest join day of the week. ***We anticipated that our March campaign, Black Card First Month Free, which was very successful during the same time last year, would improve our join momentum over the remainder of Q1 and into Q2. Yet as we moved through March and into early April, our join trends remained below our plan.***

(Emphasis added).

46.    Defendant Keating admitted that merely continuing the previous marketing campaign may have "pivoted" Planet Fitness too far, stating, in pertinent part:

To broaden our reach and reinforce that people of all fitness levels can achieve their goals at Planet Fitness, in Q4 of 2024, we began to showcase more advanced aspirational gym goers and strength equipment in our marketing, which resonated with a more fitness-minded consumer. ***This was a shift from the lighthearted approachable tone that had previously been a hallmark of our brand messaging.***

***We were encouraged by our net member growth in 2025 and made the decision to extend the campaign into 2026. However, looking at data from Q4 of last year and Q1 of this year, we saw that our messaging and targeting was successful in driving increased penetration with the fitness-minded consumer, yet we may have pivoted too far.*** To this end, we've identified 2 areas where we're sharpening and intensifying our focus this year, driving member acquisition and reinforcing affordability.

(Emphasis added).

47.    Defendant Keating then discussed the Company's sudden decision to pause the long-scheduled Black Card price increase and the impacts of this decision and the overall slowdown in joins to Planet Fitness' forward guidance, pertinently as follows:

While we conducted extensive testing over the past couple of years to support a potential Black Card price increase, the consumer and economic backdrop have shifted. ***Based on our experience, price increases create a near-term headwind to member joins. As a result, given our decision to prioritize member growth, we have decided to pause the national rollout of our Black Card price increase***. At the same time, we are a test-and-learn organization, and our objective is to evolve pricing thoughtfully and in line with our brand promise of democratizing access to fitness while delivering exceptional value. Our test-and-learn approach ensures any pricing change is deliberate, data-driven and true to who we are as a brand, reinforcing our HVLP positioning while sustaining our role as the category leader.

***Given our softer start to the year and the adjustments to our strategies, we are updating certain elements of our full year guidance. Two key factors driving the revisions are the net member growth shortfall in Q1, which has an outsized impact on the year, and our decision to pause an increase to Black Card pricing***. Tom will walk through the specifics shortly.

***These changes also impact the 3-year algorithm we shared at Investor Day last November. And as a result, we've made the decision to withdraw that outlook***.

19

(Emphasis added).

48.     Interim Chief Financial Officer Thomas J. Fitzgerald further clarified the outlook reduction, providing updated guidance for Planet Fitness, in pertinent part, as follows:

Moving on to our 2026 outlook. As Colleen noted earlier, ***given the net member growth trends in the first quarter and our decision to pause the planned national Black Card price increase, we are adjusting our 2026 guidance.*** We now expect system-wide same club sales growth to be approximately 1%; revenue to grow approximately 7%; adjusted EBITDA to grow approximately 6%; net interest expense to be approximately $111 million; adjusted net income to decrease approximately 2%; adjusted net income per diluted share to grow approximately 4% based on adjusted diluted weighted average shares outstanding of approximately 79 million*. **Our decision to pause the increase on Black Card accounts for approximately 150 bps of the reduction in our outlook for same club sales for the year. The rest of the decrease is due to softer net member growth trends.*** As we think about the composition of same club sales in the future, our goal is to have the majority of growth driven by member growth versus rate growth.

Our outlook for unit growth has not changed. We still expect between 180 and 190 new clubs system-wide and anticipate that the cadence of these openings and the related 150 to 160 equipment placements to be weighted to the second half of the year, especially the fourth quarter. We expect that re-equip sales will make up approximately 70% of total equipment segment revenue for the year with an equipment margin rate of approximately 30%. We expect the second and third quarter to each account for approximately 30% of our full year replacement equipment revenue and the fourth quarter to be approximately 15% of the full year. Lastly, we continue to expect capital expenditures to be up 10% to 15% and depreciation and amortization to be up approximately 10%.

In closing, we recognize that the operating environment has evolved in ways that require us to make some adjustments and to execute with sharpened focus on our core target. In response, we are taking proactive steps to reinvigorate net member growth and leverage our industry-leading marketing scale. Our focus will be to communicate the unique value proposition of Planet Fitness to a broader audience and ensure we connect with both our current and prospective members in a way that drives sustainable and profitable growth.

(Emphasis added).

49.     During the question-and-answer segment of the call, Defendant Keating spoke to the slowdown in new joins against Planet Fitness' prior projections and specifically pointing to the Company's messaging as a key factor, in pertinent part:

20

<Q: Randal J. Konik – Jefferies LLC – Equity Analyst> So Tom, just to kind of kind of bounce off that a little more. Coming out of the first quarter, are the trends kind of stable from first quarter into the second quarter? Are they getting worse on a net member basis? Can you kind of elaborate on that a little bit in terms of, again, arriving to the annual outlook change?

. . .

<A: Colleen Keating> Maybe I'll chime in on that a little bit. ***In March of last year, we had a very, very strong performance from our Black Card First Month Free promotion.*** And while we had some elevated churn in January and then some storm weather impacts that we were seeing coming out of January and into February, ***we anticipated very strong performance because we knew we were going to be running the Black Card First Month Free again in March, and we had softer performance than we anticipated there***. So some of those trends are what we kind of carried forward in reforecasting the rest of the year because we didn't see the momentum in March that we had anticipated.

And then maybe just to comment a little bit further on the ***marketing and the shift in messaging***, particularly because we, a couple of times a year, do a brand health tracker. We use a third-party research firm to help us evaluate how our marketing is landing. ***And when we built the 2025 campaign, "Grow Stronger Together," and "We're Are All Strong on This Planet," we were responding to what we saw in the brand tracker in early '24***, which was that we needed to communicate to consumers and prospects that you could get strong at a Planet Fitness and that we had the right complement of strength equipment. ***The early read on that marketing was that it was working and it was communicating that message***. So we saw the lift in consumer sentiment as we evaluated that campaign.

What we've come to recognize more recently, particularly in the data that ***we saw late last year and coming into this year***, was that we were penetrating a more fitness-minded consumer. But you'll remember at our Investor Day, Brian Povinelli talked about defending and enhancing. And ***what this messaging did was enhance, but we missed a little bit of the defending***. So where we had a strong ownership of the kind of the beginner or the person who might be more gymtimidated, that 70% of the population that doesn't have a gym membership today, this messaging may have resonated -- or did resonate a bit more intimidating, and we saw that in the more recent brand health data. So that's what's influencing the pivoting on the marketing messaging.

(Emphasis added).

50.    Defendant Keating continued, discussing the basis and impact of the decision to

pause the national rollout of the Black Card price increase, in pertinent part:

<Q: Randal J. Konik> Got it. And then when you think about -- when I look at the Black Card penetration, I believe it was up, and then you're talking about a broader price review. What is the kind of messaging there or thought process there? Because on one hand, you're getting that increased penetration so that fitness-minded person, I'm assuming, is appreciating the value of those amenities in the Black Card spa, yet -- are you kind of looking at that from a perspective of -- is our initial pricing to an initial gymgoer looking too high when they see that Black Card price? Or just kind of give us some perspective of why the broader price review and pausing the Black Card. Just want to get some color there.

<A: Colleen Keating> Absolutely. Great question. I'm glad you asked it. So as we think about the increased penetration that we've been experiencing with Black Card pricing and in the mid- to upper mid-60s in penetration across our membership, since we've narrowed the delta, the increase in the Classic Card price to $15 narrowed the delta between Classic and Black. ***That increased penetration is giving us price, right? It's giving us organic price lift because we're getting more penetration at the Black Card price of $24.99 versus the Classic price of $15. So to be clear, and we've said this over the past year, we are getting price from the increased penetration.***

We also -- as we've talked about, we have seen -- ***in the past where we've taken a lift in Black Card pricing, we've seen a slight headwind on joins, certainly a diminution on the penetration, but it builds back over time. Given what we saw in the first quarter and our focus on doubling down on member growth, really leaning into member growth for the rest of the year and kind of the consumer landscape and backdrop, we felt that the most prudent decision was not to put a price headwind when we're doubling down on membership growth.***

***So we've put the pause on the nationwide rollout of a Black Card price elevation.*** And we're continuing to do price testing in a number of different markets with a couple of different price scenarios. We're always going to be testing, but the Black Card price test was initiated in a different -- much different consumer environment. So ***we felt it was prudent to refresh our tests, run a couple of new ones and put the pause as we really, really lean in heavy on driving member growth between now and the end of the year.***

. . .

<Q: Maksim Rakhlenko – TD Cowen – Managing Director> Maybe piggybacking in a way to the last question. But Tom, can you -- just going back to the comp for the year at plus 1%, because -- just give us more help. You are still getting the benefit from the Black Card mix, as Colleen just discussed. You are going to be cycling the worst of click to cancel in 2Q and 3Q. And then in 4Q, you start to get the benefit from the waterfall given all the boxes that you opened late last year. So in the context of all this, sort of how do we build to the 1% comp? And then how should we think about the member versus rate contribution in the rest of the year?

<A: Thomas J. Fitzgerald>Yes. Max, so I would say that you're right, the clubs coming on board towards the end of the year into the comp base, that helps. It really does come down to the member growth. And as you know, in our business, it's not really what happened last month or last quarter. It's sort of the 12 months prior versus the prior and also the quarter's net member growth versus the net member growth in the prior quarter. ***And Q1 being so such a big piece of that net member growth change for the year, it kind of has an outsized impact that works its way through***. So I think the split -- rate volume split in Q1 was 90-10, 90 rate, 10 volume. And I think, as Colleen said, really doubling down, zeroing in on the primary goal of driving net member growth. we've got to get that split to be different than 90-10. It's kind of unsustainable.

And in our business, you can spend a lot of money to drive -- because net member growth is profitable almost no matter what you do, unless you spend an incredible amount of money very efficiently. It's almost impossible not to make net member growth profitable. So that's really what's the beauty of the model, and I think what we want to rebalance. ***But the way we're calling the year is really based on the lack of the Black Card price increase that I mentioned, which was in our original outlook, not rolling that nationally, as well as just what we've seen as Colleen and I just mentioned on the last couple of questions about what happened through March that we expected more and didn't get it.***

So we've got some work to do, and I think it will take a little bit of time to redirect it, but we're very confident that this is the right approach. And again, given our outsized spend and position in the industry and the fact that no one really goes after who we go after, we're confident that, that will fall into place and start to reaccelerate member growth and ultimately, comps. It's just going to take a while.

<A: Colleen Keating> Maybe I'll bolt on for a minute, too, just because I know you're going to -- you're looking to model, and I think -- so we get asked the question, well, we can share it broadly. ***The Black Card price was about 150 basis points of the comp for the year, right? And then I would also say kind of the seasonality and the subscription nature of the model. A miss in Q1 is harder to make up over the rest of the year***. January join represents 12 months of revenue. If we -- the marketing engine starts kicking at a higher efficiency later in the year, it will take 2 joins in January -- or 2 joins in July to make up a January join because of the seasonality in the subscription model …

(Emphasis added).

51.     The aforementioned press releases and statements made by the Individual Defendants are in direct contrast to statements they made during the November 6, 2025, November

13, 2025, January 13, 2026, and February 24, 2026 earnings and shareholder calls. On those calls, Defendants continually praised the planned Black Card price increase and the continued success of the existing marketing campaign, while continually minimizing risks associated with seasonality and weather impacts on Planet Fitness' ability to achieve its guided metrics.

52.   Investors and analysts reacted immediately to Planet Fitness' revelation. The price of Planet Fitness' common stock declined dramatically. From a closing market price of $63.96 per share on May 6, 2026, Planet Fitness' stock price fell to $44.01 per share on May 7, 2026, a decline of about 31.19% in the span of just a single day.

53.   A number of well-known analysts who had been following Planet Fitness lowered their price targets in response to Planet Fitness' disclosures. For example, Wells Fargo, while dropping its price target 18.8% to $65, highlighted the "real surprise today was a meaningful reduction in '26 guidance after the co reiterated on 3/9." Analyst Bonadio additionally noted that "paus[ing] a 20% Black Card price increase … raises questions on real value vs. rising competition and defers an expected top-line catalyst."

54.   RBC's Logan Reich slashed his price target a considerable 35% while noting "PLNT's print was below depressed investor expectations … net add headwinds continued through April, as marketing did not appear to resonate, prompting management to meaningfully lower FY guidance, pause Black Card pricing, and withdraw the 3-year outlook."

55.   The analyst further highlighted headwinds to the Company's join trends, including "macro & competitive pressures … and marketing messaging [that] didn't resonate with their core customer."  The analysts also cautioned that, "given the incremental member headwinds and Black Card price increase pause, franchisees who may have underwritten their pipelines assuming a price increase could now reassess their assumptions."

56.    William Blair, for its part, noted Planet Fitness' "member growth lagged expectations during the seasonally important first quarter on both internal misses and external factors, including a meaningful miss in marketing messaging." Analyst Zackfia pointed out that the Company's "attempt to thread the needle by attracting existing fitness club users while maintaining its appeal to first-time gym goers backfired by essentially intimidating its core market." The analyst went on, stating that Defendants' decision to pause the Black Card price hike is and "interesting" move considering the rationale is to "shift[] focus more on member growth," yet "historically Black Card price increases have not impacted join trends," but instead "impacted the rate of trade up."

57.    William Blair further highlighted the significant cut to "comp guidance … to 1% from 4% to 5% previously," and Planet Fitness' decision to withdraw "its three-year algorithm calling for 6% to 7% annual unit growth."

58.    The fact that these analysts, and others, discussed Planet Fitness' slowdown in member growth, pullback on its planned subscription price increase, reduction in full year guidance, and withdrawal of 3-year projections suggests the public placed significant weight on Planet Fitness' prior membership growth and sales estimates. The frequent, in-depth discussion of Planet Fitness' guidance confirms that Defendants' statements during the Class Period were material.

### *Additional Scienter Allegations*

59.    During the Class Period, Defendants acted with scienter in that they knew, should have known, or otherwise were deliberately reckless in not knowing that the public statements disseminated on behalf of Planet Fitness were materially false and misleading at the time they were made. Defendants had actual knowledge of, or access to, non-public information concerning the

customer response to the ongoing marketing campaigns and the continued potential to drive new joins, the results of "significant testing and data analysis" upon which the decision to rollout the national Black Card price increase was originally predicated, the ability of Planet Fitness to continue to drive membership growth, as well as the bases for the financial targets provided and the ability for the Company to meet those targets.

60.    Notwithstanding such, Defendants repeatedly and affirmatively represented to investors that Planet Fitness was well positioned to continue to implement and capitalize upon its growth initiatives to reach its 2026 fiscal targets and remained on track for its three-year growth algorithm. Defendants further repeatedly claimed confidence and reliance on their existing marketing campaigns to drive membership growth and on their planned Black Card price increase to drive sales growth.

61.    Yet, despite that headwinds were developing, Defendants remained confident, consistently praising the planned price increase without cautioning investors that the plan was at risk or that the price increase would not rollout at all if joins slowed to a certain level.

62.    Defendants' scienter was evidenced by their reiteration of the original full-year 2026 guidance on March 9, 2026. Importantly, the relevant first quarter period in which the Company has pointed to a significant slowdown in joins, closed on March 31, 2026. Indeed, during the call Defendant Keating attested that "join trends remained below [their] plan" "through March."

63.    Defendants' scienter was further evidenced by the abrupt, surprise departure and apparent termination of Defendant Stasz from his role as Chief Financial Officer of Planet Fitness less than two months prior to the setback. In fact, during the Company's next shareholder call, Defendant Keating informed investors that the 3-year algorithm Defendant Stasz had provided should no longer be considered achievable.

26

64.     Defendants' scienter was additionally evidenced by their overreliance on an existing marketing campaign from 2025. While Defendants claimed the campaign "ha[d] legs to extend into 2026." Defendants also claimed they believed the March-specific campaign, "Black Card First Month Free," would reap the same success as it had the previous year. Yet, at the same time, Defendants acknowledged that "in the data that [they] saw late last year and coming into this year," they realized they were "resonat[ing] with a more fitness-minded consumer," shifting away from their core demographic of the "more casual gym goer." Despite seeing this data, Defendants made no prior risk statements as to their market penetration, client composition, or generally to membership join rates.

65.     Finally, Defendants did not caution investors as to the possibility of a paused rollout of the Black Card price increase. Instead, Defendants highlighted to investors the "significant testing and data analysis" performed to determine when and how much to raise the Black Card membership tier price. Defendants claimed "extensive testing" was conducted "over the past couple of years to support a Black Card price increase," instilling confidence in their investors.

66.     Defendants' decision to pause the rollout was not otherwise risked by the Defendants. The guidance revision suffered an additional 150 basis points reduction in same store sales on the back of the paused rollout alone and factored into the decision to fully withdraw the Company's three-year growth algorithm.

67.     Moreover, considering the disappointing outcome was ultimately significantly blamed on a misfire of Planet Fitness' own marketing strategy and the resulting pullback of the Company's internally planned and scheduled Black Card price increase, Defendants' repeated statements of confidence in its marketing strategy, customer acquisition, and their ability to fuel

membership growth to achieve apparently lavish financial targets were, at best, deliberately reckless.

## Loss Causation and Economic Loss

68.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Planet Fitness' common stock and operated as a fraud or deceit on Class Period purchasers of Planet Fitness' common stock by materially misleading the investing public. Later, Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of Planet Fitness' common stock materially declined, as the prior artificial inflation came out of the price over time. As a result of their purchases of Planet Fitness' common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

69.     Planet Fitness' stock price fell in response to the corrective event on May 7, 2026, as alleged *supra*. On May 7, 2026, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning Planet Fitness' membership growth trends, marketing efficacy, and the viability of their subscription pricing strategies.

70.     In particular, on May 7, 2026, Planet Fitness announced significantly below-market growth expectations alongside a drastic downward revision to its previously reiterated fiscal year 2026 guidance and a full recission of its long-term targets.

## Presumption of Reliance; Fraud-On-The-Market

71.     At all relevant times, the market for Planet Fitness' common stock was an efficient market for the following reasons, among others:

(a)      Planet Fitness' common stock met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)      Planet Fitness communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)      Planet Fitness was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)      Unexpected material news about Planet Fitness was reflected in and incorporated into the Company's stock price during the Class Period.

72.      As a result of the foregoing, the market for Planet Fitness' common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in Planet Fitness' stock price. Under these circumstances, all purchasers of Planet Fitness' common stock during the Class Period suffered similar injury through their purchase of Planet Fitness' common stock at artificially inflated prices, and a presumption of reliance applies.

73.      Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

74.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with fiscal 2026 growth guidance and a long-term three-year growth algorithm. Defendants provided the public with forecasts that failed to account for systemic defects in their core customer acquisition strategy or otherwise account for the ongoing erosion in beginner gym-goer net joins, despite possessing internal tracking data that revealed their current marketing campaign was intimidating and alienating this core demographic.

75.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

76.    Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of Planet Fitness who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or

30

relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

77.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Planet Fitness' common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

78.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Planet Fitness' common stock were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Planet Fitness or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of February 20, 2026, there were 79.698 million shares of the Company's Class A common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

31

79.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

80.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

81.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Planet Fitness;

(c)    whether the Individual Defendants caused Planet Fitness to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of Planet Fitness' common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

82.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

83.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

84.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

85.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Planet Fitness common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire

Planet Fitness' securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

86.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Planet Fitness' securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

87.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

88.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of Planet Fitness' internal affairs.

89.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Planet Fitness' businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Planet Fitness' common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Planet Fitness' common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

90.     During the Class Period, Planet Fitness' common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Planet Fitness' common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Planet Fitness' common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Planet

Fitness' common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

91. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

92. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

93. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

94. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about Planet Fitness' misstatements.

95. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Planet Fitness which had become materially false or misleading.

36

96.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Planet Fitness disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Planet Fitness to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Planet Fitness' common stock.

97.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause Planet Fitness to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

98.     By reason of the above conduct, the Individual Defendants and/or Planet Fitness are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 14, 2026                                 Respectfully submitted,

**BOYNTON, WALDRON, DOLEAC,
WOODMAN & SCOTT, P.A.**

*s/ Michael H. Darling*
Michael H. Darling, Bar #265326
82 Court Street
Portsmouth, NH 03801
Tel.: (603) 436-4010
Fax: (603) 431-9973

-and-

**LEVI & KORSINSKY, LLP**
Adam M. Apton (*pro hac vice* forthcoming)
33 Whitehall Street, 27th Floor
New York, New York 10004
Tel.: (212) 363-7500
Fax: (212) 363-7171
Email: aapton@zlk.com

*Attorneys for Plaintiff*

# Exhibit 1.

# CERTIFICATION OF NAMED PLAINTIFF PURSUANT TO FEDERAL SECURITIES LAWS

I, Norie Matsunaga                , duly certify and say, as to the claims asserted under the federal
Name

securities laws, that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this action.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Planet Fitness, Inc. which are the subject of this litigation during the class period set forth in the complaint are set forth in the chart attached hereto.

5. Within the last 3 years, I have not sought to serve nor have I served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this:

May 30, 2026
Date

Norie Matsunaga
Name



Signature

| Date of Transaction | Transaction Type | Quantity | Price per Share |
|---|---|---|---|
| 04-10-2026 | P | 25 | $ 72.2300 |